**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
LAFAYETTE DIVISION**

| | |
|---|---|
| MELISSA KAY RILEY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:12-CV-42 |
| ) | |
| CAROLYN W. COLVIN[1], ) | |
| ACTING COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## **OPINION AND ORDER**

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits and Supplemental Security Income to Plaintiff, Melissa Kay Riley. For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

BACKGROUND

On May 21, 2009, Melissa Kay Riley ("Riley" or "claimant") applied for Social Security Disability Benefits ("DIB") under Title

---

[1]On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25, Carolyn W. Colvin is automatically substituted as the Defendant in this suit.

II of the Social Security Act, 42 U.S.C. section 401 et seq. and Supplemental Security Insurance ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. sections 1381 et seq. The application originally indicated that Riley's disability began on December 15, 2006. During the pre-hearing screening process the onset date was amended to August 26, 2008. (Tr. 167).

The Social Security Administration denied Riley's initial applications for benefits and also denied her claims on reconsideration. On January 27, 2011, Riley appeared with counsel by way of video conference at an administrative hearing before Administrative Law Judge Cynthia M. Bretthauer ("ALJ Bretthauer"). Testimony was provided by the claimant and Margaret H. Ford (a vocational expert). On February 23, 2011, ALJ Bretthauer denied the claimant's DIB and SSI claims, finding that Riley had not been under a disability as defined in the Social Security Act.

The claimant requested that the Appeals Council review the ALJ's decision and the request was denied. Accordingly, the ALJ's decision became the Commissioner's final decision. *See* 20 C.F.R. § 422.210(a)(2005). The claimant has initiated the instant action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 1383(c).

DISCUSSION

Riley was born on June 23, 1968. She alleges the following impairments: multiple sclerosis, degenerative disc disease, hypertension and depression. Her past relevant work includes certified nursing assistant, housekeeper and convenience store clerk. The medical evidence of record is adequately summarized by the claimant's counsel and, in a nutshell, is as follows:

In the fall of 2006, Riley went to the emergency room twice for severe acute onset headaches and hypertensive crises. She underwent a lumbar puncture and CT. Both were normal, but an MRI showed a large demyelinating-appearing legion in the splenium of the corpus callosum and some scattered white matter lesions compatible with demyelination of microvascular disease. During these emergency room visits, Riley was treated and released. (Tr. 312-319, 445, 491).

Due to daily headaches, Riley saw Dr. Scott Hoyer, a neurologist, on February 1, 2007. (Tr. 491). Dr. Hoyer noted that the MRI results showed evidence of multiple sclerosis. Riley told Dr. Hoyer that her headaches were there when she awoke and that pain medication would only dampen down the pain. Riley also reported that at times she had nausea, blurred vision, and photophobia. (Tr. 491). Dr. Hoyer's plan was to treat the headaches with amitriptyline and beta-blockers and get repeat MRI scans of the brain and an MRA of the circle of Willis. (Tr. 493).

An MRI of the brain on February 16, 2007, showed white matter lesions and a diagnosis of MS, although there was a decrease in size of the lesions since the previous MRI. (Tr. 440).

Riley's headaches continued, and she visited the emergency room for headaches again in May and August of 2007. (Tr. 348-357; 457-458). A follow-up brain MRI on September 21, 2007, showed that deep matter lesions appeared to be stable and that there were no new lesions, but that there were areas of "increased signal." (Tr. 339).

Dr. Hoyer's notes from a visit on February 20, 2008, state that Riley was not doing well and had pain in her back and legs, but she was going back to work as a nursing assistant and was waiting for her state test results. Riley had mild difficulty with tandem gait but was described as clinically stable. Riley declined to have new MRIs scheduled due to cost. (Tr. 485). Riley's medications were adjusted, and Dr. Hoyer advised Riley to apply for assistance to start Avonex for MS treatment. (Tr. 483-85).

An April 11, 2008, MRI of the brain showed Riley had a stable white matter lesion. (Tr. 335-336). An MRI of the lumbar spine on May 12, 2008, showed a small protruding disc at L4-L5 with minimal encroachment on the anterior thecal sac. There were degenerative changes at L5-S1 and a disc protrusion with "mild right-sided neural foraminal stenosis and moderate to severe left-sided neural foraminal stenosis." (Tr. 332).

Riley was involved in a motor vehicle accident on July 4, 2008, and received emergency room treatment. (Tr. 323-324). She had an avulsion fracture of the proximal humerus left shoulder, acute cervical strain, left hip contusion, and abdominal pain. (Tr. 325). Riley's shoulder was immobilized and she was referred to Dr. Peter Torok, an orthopedist, for treatment of the fracture. Dr. Torok saw Riley on July 10, 2010. (Tr. 559). Riley noted some improvement in symptoms, but numbness and tingling in the extremity. Dr. Torok assessed "left shoulder traumatic impingement" but felt Riley could return to full duty work by July 16, 2010. (Tr. 559).

Riley saw Dr. Tonia Kusumi at the Pain Care Center on October 6, 2008, for her "long history of neck and lower back pain." (Tr. 565). There was pain on palpation of the paraspinal muscles. Riley and Dr. Kusumi discussed the pathology of the pain and prior improvements in her pain following lumbar epidural steroid injections. Riley noted that, even with the steroid injections, she continued to experience radiculopathy. Dr. Kumsumi added a prescription for Lyrica and ordered physical therapy 2-3 times per week for four weeks. (Tr. 367-368).

Dr. Duan Pierce examined Riley on November 6, 2008. (Tr. 580).[2] According to Dr. Pierce's report, Riley was unable to bend

---

[2] According to Riley's counsel, this examination was performed as part of a prior application for benefits.

over and get back up without difficult and there was tenderness to palpation of the spine. Riley's straight leg raise test was positive. She had weakness in her bilateral extremities, more on her left (3/5) than on her right (4/5). He noted that the patient would be able to work with limitations on standing no more than "3-4 hours or lift more than 30 lbs." (Tr. 582).

Dr. Caryn Brown, a psychologist, evaluated Riley on November 13, 2008.[3] Dr. Brown performed a mental status examination and administered the Wechsler Memory Scale (3rd edition) and concluded that overall memory functioning fell within the normal range. Dr. Brown diagnosed Riley with an adjustment disorder with depressed mood and assessed a Global Assessment of Functioning ("GAF") score of 61.[4] (Tr. 586-589).

Riley also underwent a mental status exam on July 28, 2009. Dr. Aldo Buonanno noted that Riley had difficulty performing serial 7's. Riley's mood was depressed and she had crying episodes. Dr. Buonanno diagnosed major depression and assessed a GAF of 60.[5] (Tr. 592-594).

Riley saw Dr. Hoyer again on August 11, 2009, and complained

---

[3] Riley's counsel represents that this evaluation also took place as a result of a prior application for benefits.

[4] GAF is a scoring system for measuring an individual's overall functional capacity. A GAF of 61 would represent some mild symptoms or some difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000).

[5] A GAF of 60 would indicate moderate symptoms or moderate difficulty in social, occupational, or school functioning.

of muscle spasms. (Tr. 597). In September of 2009, Dr. Dodt ordered a cane for Riley. (Tr. 595).

Riley sought outpatient mental health treatment at the Raj Clinic in January of 2010. On January 11, 2010, Dr. Umamaheswara Kalapatapu evaluated Riley. (Tr. 711). Riley complained of lack of motivation to complete daily tasks. Dr. Kalapatapu noted that she was "anxious and depressed looking." His assessment was recurrent, severe major depressive disorder and generalized anxiety disorder. Dr. Kalapatapu assessed a GAF of 50.[6] (Tr. 709-711). Riley's medications at that time included Xanax, Zoloft and Wellbutrin. (Tr. 711).

Riley began seeing Dr. Albert Lee, a neurologist, on February 4, 2010, and complained of tightness in her lower extremities and muscle spasms in her arms.[7] She noted she had involuntary shaking of her extremities and had fallen several times. Dr. Lee also noted gait ataxia. Dr. Lee recommended additional testing and noted that "the patient has definitely changed from baseline neurologic status." (Tr. 689-691). An MRI performed on February 16, 2010, showed a stable white matter lesion in the left parietal lobe and a new white matter lesion in the left superior frontal lobe. (Tr. 677, 687).

---

[6] A GAF of 50 would indicate serious symptoms or any serious impairment in social, occupational, or school functioning.

[7] Riley testified that she started seeing Dr. Lee instead of Dr. Hoyer because she was dissatisfied with the care she received from Dr. Hoyer.

On March 2, 2010, the claimant reported to Dr. Lee that she was having dizzy spells and was at risk for falling. Dr. Lee noted she might have focal motor seizures and ordered central nervous system testing. His impression was multiple sclerosis, gait ataxia, history of involuntary shaking, lower extremity tightness and numbness as well as weakness, and bilateral carpal tunnel syndrome. Her medication was changed from Avonex once per week to Rebif three times per week. (Tr. 688, 716, 743).

Riley had a series of EEGs in March 2010. Video EEGs on March 9, 2010, and March 26, 2010, were normal. (Tr. 695-96). However an ambulatory 72-hour EEG performed March 2, 2010, through March 5, 2010, noted a few sharp discharges and was considered an abnormal EEG. (Tr. 697).

On June 29, 2010, Riley complained to Dr. Lee of right sided neck pain that spread to the occipital area. She also complained of dizzy spells that caused her to fall and collapse and left sided headaches. (Tr. 692-694). Dr. Lee's diagnostic impression included multiple sclerosis, gait ataxia and falls, recurrent dizzy spells and syncope, question of seizure disorder, history of involuntary shaking, and lower extremity tightness, numbness, and weakness and bilateral carpal tunnel syndrome. He noted that "[t]he patient has flare up of symptoms and is changed from baseline neurologic status." (Tr. 693). He recommended neurophysiologic studies, a nerve conduction study, injection therapy to the lumbar spine,

Neurontin for pain control, and further follow up in the neurology clinic. (Tr. 694).

On September 14, 2010, Dr. Lee noted that Riley's injection site was getting red and inflamed. (Tr. 730). The next week, on September 21, 2010, Riley was again evaluated by Dr. Lee. He noted weakness and numbness in the legs in keeping with sciatica. He also noted neck pain that extended into her arms and radiated to the occipital area in keeping with neuralgia. He further noted recurrent dizzy spells, unsteadiness, falling, and collapsing. (Tr. 726). At this visit, Dr. Lee performed Infrared Video-Electronystagmograpy (VENG) testing to rule out inner ear dysfunction and noted that "patient has shown worsening and progressive symptoms." (Tr. 729). Two days later, on September 23, 2010, another video EEG was performed. It resulted in normal findings. (Tr. 725).

Riley attended physical therapy for her neck, shoulder, and lower back pain from September 25, 2010, until November 10, 2010. (Tr. 742-750). She was discharged on November 24, 2010, after failing to show for three appointments. (Tr. 742).

On October 26, 2010, Riley reported staring spells and "spacing out episodes" to Dr. Lee. She further reported that her neck pain was spreading to her shoulders and that she suffered low back pain that radiated to her legs. (Tr. 721-724). Dr. Lee added a prescription for Phrenilin for headache control. (Tr. 723). He

also recommended a new neurophysiologic study including an EEG to look for beakthrough seizures and a nerve conduction study to look for an underlying pinched nerve. (Tr. 723-24). Dr. Salman Wali performed the nerve conduction studies ordered by Dr. Lee on November 4, 2010. (Tr. 721). The study results were abnormal and provided evidence of "predominantly sensory axonal peripheral neuropathy." (Id.).

Riley went to the emergency room on November 1, 2010, complaining of sharp right arm pain. An x-ray of the shoulder showed calcific suprasinatus tendinitis. (Tr. 741).

On April 26, 2011, after ALJ Bretthauer issued her decision in this case, Riley's counsel submitted additional information from Dr. Lee to the Appeals Council. (Tr. 309). Dr. Lee opined that Riley suffered "from significant, reproducible fatigue of motor function with sustainable muscle weakness on repetitive activity, that has been demonstrated on physical examination, that results from neurological dysfunction from areas in the central nervous system known to be pathologically involved in the multiple sclerosis process." Dr. Lee further opined that Riley suffers flu symptoms when she takes her Rebif and these symptoms can last up to 1 ½ days following an injection. Dr. Lee indicated Riley would miss about 6 ½ days of work per month. (Tr. 309).

Riley testified that she has completed the eleventh grade and has not received a GED. She lives in an apartment with her three

sons. Her last job was as a certified nurse's assistant. She testified that her employer made special accommodations for her by assigning her to a patient that needed very minimal care, but there came a point where she could not perform even that job. She further testified that she cannot work as a home companion because she is unstable on her feet and is uncertain she could perform her duties in an emergency. She additionally claimed problems with memory and stress would interfere with her work. When asked why she could not perform a simple job that did not require a lot of memory and where she could stand and sit whenever she needed, Riley indicated that she is "really weak." Riley's medication was changed to Rebif because the Avonex was not helping, but Rebif is taken three times per week and causes her to feel "really sick." When she last worked, she was on Avonex instead of Rebif.

With regard to the physical therapy ordered for her back, Riley testified that she attended physical therapy briefly but that it made the pain worse so she stopped going. She also had injections for her back but they helped with the pain for only a brief time. When asked to describe her pain, Riley indicated that she has pain across her lower back that goes down her left leg. She described the pain as shooting at times. Her legs and feet get numb. She has burning pain between her shoulder blades. Her arms are weak. She has muscle spasms in both her arms and legs. Riley uses patches, heat, and rubbing for pain. At the time

-11-

of the hearing, Riley was taking muscle relaxants and Neurontin for pain.  She was not seeing a pain management doctor but was waiting to see Dr. Casumi.  Dr. Casumi had previously refused to see Riley due to missed appointments, but Riley hoped the doctor would again see her as a patient.

Riley also testified that she sees her psychiatrist, Dr. Kalapatapu, about once a month for both therapy and medication management.  She cries almost daily and sometimes does not leave her room for days.

Riley testified that she can walk about a block before stopping, stand 20 minutes if she can move back and forth, and sit 20 to 30 minutes.  She uses a cane.  Riley cannot lift her granddaughter who weights 19 pounds.  On an average day, she wakes up around 6:00 a.m. and, after her boys go to school, she starts cleaning.  She cleans throughout the day because she must take breaks.  If she has an appointment she goes to it.  Her children help with the cooking, dishes, and laundry.  She is able to bathe and dress herself.  She gets groceries but takes her kids with her.  Dr. Hoyer recommended exercise, but she gets very little exercise other than walking to the city bus and cleaning her house.  As far as hobbies, Riley likes to read and spend time with her granddaughter, although she does not babysit her.

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB or SSI benefits under the Social Security Act, the claimant must establish that she is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A) and 1382(a)(1). To

determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1: Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2: Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3: Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes, then claimant is automatically disabled; if not, then the inquiry proceeds to step 4.

Step 4: Is the claimant able to perform his past relevant work? If yes, the claim is denied; if no, the inquiry proceeds to step 5, where the burden of proof shifts to the Commissioner.

Step 5: Is the claimant able to perform any other work within his residual functional capacity in the national economy: If yes, the claim is denied; if no, the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); see also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Riley suffered from severe mental and physical impairments that significantly affected her ability to work. The ALJ further found that Riley did not meet or medically equal one of the listed impairments, and could not perform her past relevant work, but nonetheless retained the residual functional capacity ("RFC") to perform a limited range of sedentary work as follows:

> sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except the claimant is: unable to lift/carry more than 10 pounds frequently and 5 pounds occasionally; unable to stand and/or walk for more than 2 hours in an 8-hour workday; able to sit for 6 to 8 hours in an 8-hour workday; unable to stoop, crawl, climb, crouch, kneel or balance more than occasionally; must avoid concentrated exposure to extreme heat; and cannot perform more than simple, unskilled work.

(Tr. 54).

After considering Riley's age, education, work experience and RFC, the ALJ relied upon the testimony of a vocational expert and concluded that Riley was not disabled and not entitled to DIB or SSI because she retained the capacity to perform a significant number of jobs despite her functional limitations. (Tr. 55). Thus, Riley's claim failed at step 5 of the evaluation process. Riley believes that the ALJ committed several errors requiring reversal.

Credibility

Riley argues that the ALJ improperly discredited her testimony in violation of SSR 96-7p by relying on meaningless boilerplate language without elaborating on which facts, if any, undermined her credibility. The Commissioner disagrees.

Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*,

390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). "In assessing a claimant's credibility, the ALJ must consider subjective complaints of pain if the claimant can establish a medically determined impairment that could reasonably be expected to produce the pain." *Indoranto*, 374 F.3d at 474 (citing 20 C.F.R. § 404.15.29, SSR 96-7p; *Clifford*, 227 F.3d at 871).

Further, "the ALJ cannot reject a claimant's testimony about limitations on [his] daily activities solely by stating that such testimony is unsupported by the medical evidence." *Id*. Instead, the ALJ must make a credibility determination that is supported by record evidence and sufficiently specific to make clear to the claimant, and to any subsequent reviewers, the weight given to the claimant's statements and the reasons for the weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply with the requirements of SSR 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002). This ruling requires ALJs to articulate

"specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; *Golembiewski*, 322 F.3d 912, 915-16 (7th Cir. 2003).

Here, ALJ Bretthauer determined that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of

these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 55). Nearly identical language was criticized by the Seventh Circuit in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). That criticism will not be repeated here. The boilerplate language utilized by ALJ Bretthauer is unhelpful at best, and by itself, such language is inadequate to support a credibility finding. *See Richison v. Astrue*, No. 11-2274, 2012 WL 377674 (7th Cir. 2012).

Where boilerplate language such as that utilized by the ALJ is accompanied by additional reasons, a credibility determination need not be disturbed. *Id.* The Commissioner argues that the ALJ's opinion contains more that mere boilerplate language in support of her credibility determination. According to the Commissioner, the ALJ has offered several reasons for her credibility determination. The Commissioner directs this Court to the record at pages 49-54. This is essentially the entire substantive opinion of the ALJ prior to her credibility determination, but this Court's review cannot produce a single reference to credibility other than that provided the ALJ's statement of the legal standard to be applied and in the boilerplate referenced above. Certainly, there are facts included which the ALJ *could have* utilized in supporting her credibility determination, but the ALJ did not make the necessary connections. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)(where an ALJ failed to analyze the factors set forth in SSR 96-7p, the ALJ

did not build a logical bridge between the evidence and his conclusion that the claimant's testimony was not credible). Because the ALJ failed to build a logical bridge between the evidence and her determination that the claimant's testimony was not credible, remand is required.

Riley's Remaining Arguments

Having found remand necessary on the basis of the ALJ's credibility determination, this Court finds no compelling reason to address Riley's remaining arguments in detail. This Court has considered Riley's request that this Court award benefits rather than remand the case for additional proceedings but finds remand more appropriate here. On remand, the ALJ is instructed to utilize the proper onset date, August 26, 2008. Furthermore, the ALJ should consider all of the evidence in the record, including Dr. Lee's report from April of 2011, and, if necessary, give the parties the opportunity to expand the record so that the ALJ may build a logical bridge between the evidence and her conclusions. Because Dr. Lee's report has a direct bearing on the ALJ's analysis at step 3, the ALJ will need to consider and address whether this report requires an updated medical opinion as to medical equivalence under SSR 96-6p or necessitates any change in her step 3 analysis.

CONCLUSION

For the reasons set forth above, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** for proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).


**DATED: August 05, 2013**                **/s/ Rudy Lozano, Judge**
                                          **United States District Court**